UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

GUCCI AMERICA, INC.,

                  Plaintiff,

                -against-

EXCLUSIVE IMPORTS INTERNATIONAL,
CYRIL ISRAELSON, INNOPEX, LTD., AARON
WEXEL, JOSHUA FRANKEL, IMPERIAL
TRADING LTD., AND JOHN DOES 1-10,

                Defendants.

------------------------------------------------------X

99 Civ. 11490 (RCC)

OPINION & ORDER

**RICHARD CONWAY CASEY, United States District Judge:**

    This case involves the Gucci brand trademark and seven allegedly counterfeit watches. The Court has previously ruled on discovery issues, including a Rule 72(a) appeal by Plaintiff Gucci America, Inc. ("Plaintiff" or "Gucci"). Now before the Court are the parties' cross-motions for summary judgment.

    For the following reasons, Plaintiff's motions are **GRANTED** and Defendants' motions are **DENIED**.

## I.    BACKGROUND

    The following facts are undisputed unless otherwise indicated.

    Gucci is a New York corporation in the fashion business. Both directly and through related companies and licensees, Gucci manufactures and sells jewelry, watches, handbags, fashion accessories, and apparel. Gucci owns the trademark and trade name GUCCI (the "Gucci Trademark") and has registered a number of related trademarks with the United States Patent and Trademark Office. (Compl. ¶ 2, 12-13.) Plaintiff adopted the Gucci Trademark as early as 1957 for various items of merchandise, including watches.

    Defendants include three companies and three individuals (collectively, "Defendants").

Defendant Exclusive Import International, Inc. ("Exclusive Imports") is a New York corporation, formed in 1991, that buys and sells branded merchandise such as pens, ceramics, glassware, and watches. (Israelson Decl.) Defendant Cyril Israelson is the owner of Exclusive Imports. (Israelson Decl.) Defendant Innopex, Ltd. ("Innopex") is an Ontario, Canada corporation and a seller of chinaware, crystal, and giftware. Defendant Imperial Trading, Ltd. ("Imperial") is a Barbados corporation and a subsidiary of Innopex. Defendant Joshua Frankel is the president of Innopex and a director of Imperial. (Frankel Decl.) Defendant Aaron Wagschal, listed in the complaint as Aaron Wexel, is an employee of Innopex.

This litigation involves approximately 1200 watches purported to be genuine Gucci watches in three different Gucci styles: Gucci models 1400, 1500, and 1900. Gucci only seeks summary judgment on Defendant's liability with respect to seven watches. These watches are seven of nine watches taken as samples (the "Sample Watches") from a shipment of 500 watches sent in October 1999 by defendant Exclusive to Kay International, one of Exclusive's customers located in Woodland Hills, California. Kay International refused the shipment of 500 watches because it had been informed by Gucci that the watches it had been receiving likely were counterfeit. (Hira Decl.)

Exclusive had sent earlier shipments of purportedly genuine Gucci watches to Kay International in July, August, and September 1999. Exclusive acquired the watches in all of the shipments, including the October 1999 shipment of 500 watches, in New York by from defendants Imperial and Innopex, who, in turn, had obtained the watches from a Singapore supplier named Victron PTE, Ltd.

When Kay International refused the last shipment of 500 watches, sending them back to Exclusive in New York, Israelson, the principle of Exclusive, spoke on the phone with Wagshal and arranged to have the watches picked up for return. Boruch Teitelbaum then picked up the watches from Exclusive and returned them to the ultimate supplier, Victron, in Singapore. Teitelbaum kept the nine Sample Watches as a record of what was returned. These watches were later given to defense counsel and eventually marked as Defendants' Exhibits 3 through 11. For purposes of its

summary judgment motion, Gucci relies on seven of these nine watches to show that Defendants infringed the Gucci trademark by selling or offering for sale counterfeit watches.

Plaintiff seeks partial summary judgment on the issue of liability for its Lanham Act trademark infringement claims. Plaintiff also asks for summary judgment on Defendant's counterclaim for tortious interference with contract. Defendants move for summary judgment on the issues of willfulness; the individual liability of and personal jurisdiction over defendants Innopex, Inc., Joshua Frankel, and Aaron Wagschall; and Plaintiff's claims for injunctive relief. The Court will address each motion in turn.

## II. DISCUSSION

### A. Standard of Review

The Court will grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether such issues exist, the Court must resolve ambiguities and draw reasonable inferences in favor of the non-moving party, see Tindall v. Poultney High Sch. Dist., 414 F.3d 281, 284 (2d Cir. 2005), or, "when cross-motions for summary judgment are filed, against the party whose motion is under consideration," id. (internal citations and quotations removed).

Of course, "[t]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice" to survive a motion for summary judgment. Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). The substantive law establishes materiality, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

The moving party bears the initial burden of showing an absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (U.S. 1986). Once the moving party makes such a showing, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Matsushita Electric Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (stating that a party opposing a summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). "The non-moving party may not rely on conclusory allegations or unsubstantiated speculation" to survive a summary judgment motion. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)

### B.    Lanham Act Liability

Gucci seeks partial summary judgment on the issue of liability for its Lanham Act claims against Defendants. Under Rule 56(c) of the Federal Rules of Civil Procedure, "summary judgment . . . may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." Fed. R. Civ. P. 56(c).

Gucci claims trademark infringement under both § 32 of the Lanham Act, codified at 15 U.S.C. § 1114, and § 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a). Under 15 U.S.C. § 1114(1)(a), a plaintiff may prevail on a trademark claim upon showing that the defendant used in commerce, without plaintiff's consent, a "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." Similarly, 15 U.S.C. § 1125(a) provides civil liability for any person who "in connection with any goods . . . uses in commerce any word, . . . name, symbol, . . . or any combination thereof, or any false designation of origin . . . which . . . is likely to cause confusion . . . or to deceive as to the affiliation . . . or as to the origin . . . of [the] goods."

The Court analyzes both Lanham Act claims under the two-prong test described in Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072 (2d Cir. 1993). See Virgin Enters. v. Nawab,

4

335 F.3d 141, 146 (2d Cir. 2003). This test asks first whether the plaintiff's mark is valid and entitled to protection, and second whether the defendant's use of the mark is likely to cause confusion as to the origin of the goods. Gruner, 991 F.2d at 1074.

### 1. Validity of the Mark

As for the first prong of the Gruner test, Gucci has provided certified copies of its federal registrations showing the Gucci Trademark has been registered on the Principal Register of the Patent and Trademark Office. These registrations are prima facie evidence that the Gucci mark is valid, that Plaintiff owns the mark, and that Plaintiff has the exclusive right to use the mark in commerce. 15 U.S.C. § 1057(b); see also Gruner, 991 F.2d at 1076. Further, because Gucci utilized the mark continuously for more than five years, the marks have become incontestible. 15 U.S.C. § 1065. Because the mark is now incontestible, its registration "shall be conclusive evidence . . . of [Gucci's] exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b).

In an attempt to refute this evidence, Defendants point to the deposition testimony of a Gucci witness, Robert Artelt, who at the time of his deposition was a managing director of sales for Gucci Timepieces America, a division of plaintiff Gucci America, Inc. Artelt testified at his deposition that he did not know who owned the Gucci trademark. Defendants' argument on this point lacks force. That an employee, even a high level executive, does not have knowledge about the ownership of Gucci's marks, is not enough to rebut the conclusive evidence of Gucci's registered mark. See 15 U.S.C. § 1115(b).

Defendants have not shown a triable issue of fact as to the validity of Gucci's mark. The mark is valid, strong, and entitled to protection.

### 2. Likelihood of Confusion

The second prong of the Gruner test is the likelihood of confusion. Gruner, 991 F.2d at 1074. In assessing whether a defendant's use of a mark is likely to cause confusion, courts generally weigh the factors articulated by Judge Friendly in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961), which include: 1) the strength of plaintiff's mark; 2) the similarity of plaintiff's and

defendant's marks; 3) the proximity of the products; 4) the likelihood that plaintiff will "bridge the gap"; 5) actual confusion between products; 6) good faith on the defendant's part; 7) the quality of defendant's product; and 8) the sophistication of the buyers. However, "where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each Polaroid factor because counterfeit marks are inherently confusing." Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005). Accordingly, the Court need only consider whether there are triable issues of material fact regarding whether the seven accused watches are indeed counterfeit and whether Defendants distributed the watches. Id.

### a. Plaintiff's Expert

To show that seven of the Sample Watches were counterfeit, Plaintiff relies primarily on the declaration of Jean Michel Guerry, filed under seal with the Court. Guerry serves as the technical and development director for Luxury Timepieces, S.A., a corporate affiliate of plaintiff Gucci America.

Defendants object to the Guerry declaration, but they have not made a formal motion to strike the declaration. Regardless, Defendants' objections are meritless. Defendants object to the declaration on three grounds: 1) that the translator is anonymous and that the foreign language version has not been provided, 2) that Defendants were not allowed to take discovery from Gucci's foreign affiliates, and 3) that there were only expert reports for three of the seven watches which Guerry determined to be counterfeit. Each of these objections can be easily dismissed.

With regard to the first objection, unlike in the unpublished case cited by Defendants, Quiroga, S.L. v. Fall River Music, No. 93 Civ. 3914, 1998 WL 851574 at *26 (S.D.N.Y. 1998), there is no reason here to question the authenticity of the Guerry declaration. Cf. Quiroga, 1998 WL 851574 at *26 (describing how one version or another of an affidavit appeared to have been "cut and pasted" above the signatures of the notary and the affiant). Further, Gucci has submitted the declaration of Jean-Marc Vuithier, a Swiss attorney who provided the translation.

Defendants' second objection to the Guerry declaration also lacks merit. Contrary to

Defendants' assertion, they enjoyed extensive discovery from Gucci Group N.V., and at least two of Gucci's deposition witnesses testified as to the relationship of the Gucci corporate affiliates as well as the manufacturing and quality control activities of Gucci Group N.V.

The case cited by Defendants to support their third objection to the Guerry declaration, Revlon Consumer Prods. Corp. v. Estee Lauder Cos., No. 00 Civ. 5960, 2003 WL 21751833 at * 4-5 (S.D.N.Y. 2003), is not at all pertinent to the situation here. In that case, Magistrate Judge Peck recommended that a defendant's expert affidavit be stricken because the declaration was submitted in direct contradiction to a discovery order previously entered by the magistrate judge. There is no such order in this case, and Defendants were provided with most of the content of the Guerry declaration during discovery .

Thus, the Court can find no reason to strike the Guerry declaration and will therefore consider it for purposes of adjudicating the instant motions.

### b. Authenticity of the Sample Watches

In his declaration, Guerry explained his personal knowledge of Gucci's manufacturing procedures and his expertise regarding Gucci's quality-control methods. Guerry detailed the process by which Gucci tracks each watch that it manufactures; specifically, that Gucci records the serial numbers of each watch along with other identifying information in a computer database. According to Guerry, this process begins when Gucci delivers a precise number of components needed for the assembly of each watch to the assemblers that it hires for that purpose. Guerry also explained that Gucci maintains for each genuine watch a record of that watch's model number, serial number, case and bracelet color, dial color, assembler, work order number, and customer.

Guerry compared the Sample Watches to Gucci's computer records by matching each watch's serial number to the corresponding database entry for that serial number and contrasting each watch's characteristics with what was listed in the database. For the seven of the nine Sample Watches, there were discrepancies in the case, bracelet, and dial colors. Because Gucci records identifying information about each genuine watch that it produces and sells, these discrepancies are

very strong indicators that the watches are counterfeit. As for the two Sample Watches whose colors matched the computer records, Guerry notes that it would be necessary to analyze the watch components to determine whether the watches are counterfeit. For its summary judgment motion, Gucci relies on the seven Sample Watches that do not match its own records and does not attempt to show the inauthenticity of the other two Sample Watches. The Court finds that the Guerry declaration provides prima facie evidence that the seven accused watches are counterfeit.

To overcome Gucci's prima facie evidence that the seven Sample Watches are counterfeit, Defendants must produce specific evidence sufficient to create a genuine question of material fact on this issue. See Fed. R. Civ. P. 56(e); Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d Cir. 2005). Defendants' attempt to do so amounts to little more than smoke and mirrors. Defendants emphasize the deposition testimony of Gucci witnesses who testified that Gucci's quality-control efforts were stringent but not foolproof. For example, Sharon Eshett testified that it was possible, but highly unlikely, that human error could cause inaccurate records in Gucci's computer database. Defendants, however, have not provided any specific evidence that mistakes have occurred; their assertions to that effect are mere speculation, not disputed facts.

In addition, the report from Defendants' expert, appraiser Edward Lewand, fails to rebut Gucci's evidence of counterfeit. In his report, Lewand opined that quality control in the manufacturing of watches was necessarily limited, that he had never seen such good quality counterfeits, and that "so many differences exist in time of manufacturing and manufacturing technology and style that Gucci can not make a definitive conclusion that the [Sample Watches] are not genuine by comparing the accused watches to current production." (Thomashower Decl. Ex. G at 4.) But, Gucci's proof is not based on a comparison of the seven Sample Watches to genuine Gucci watches; rather, the Guerry declaration matches the serial numbers of the Sample Watches to Gucci's computerized database and then cross-checks for other characteristics of those specific watches. Even accepting everything in Lewand's report as true, Defendants have not presented an issue of material fact as the whether the Sample Watches were genuine.

At best, Defendants have shown that the watches were good counterfeits. Defendants have not shown evidence on which a jury could reasonably find that the watches were genuine. See Scotto, 143 F.3d at 114.

### c.     Distribution

Likewise, there is no triable issue of fact regarding whether Defendants distributed the Sample Watches. According to the unrefuted declaration of Gobrind Hira, Kay International never took possession of the shipment of watches containing the Sample Watches. Kay International refused to accept the shipment and instructed the shipping company to return the shipment to Exclusive. (Hira Decl. 3.) Defendants themselves explain that when the shipment came back from Kay International, nine sample watches were removed and the rest of the shipment was sent back to the Defendants' ultimate supplier, Victron, in Singapore. The nine Sample Watches include the seven counterfeit watches on which Gucci bases its summary judgment motion. Clearly, then, Defendants used these seven watches in U.S. commerce by offering them for sale. Defendants' effort to dispute the source of these watches by challenging the credibility of Gobrind Hira, who was involved in a separate but related lawsuit in the Central District of California against defendants Exclusive and Israelson, is insufficient to refute Mr. Hira's declaration. "Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact." Island Software, 413 F.3d at 262. Moreover, Defendant's arguments regarding watches other than the seven counterfeit watches are simply immaterial.

Finally, Defendants dispute summary judgement for defendants Innopex, Frankel, and Wagschal on the grounds that those defendants "did not purchase, sell or inventory the accused watches." (Def.'s Mem. Opp. Pl's Mot. Summ. J. at 22.) Contrary to Defendants' assertions, individual actors, including corporate officers and employees, who participate in trademark infringement can be held liable. Indeed, it has long been the case that for "torts of misfeasance, like the violation of a trade-mark, agents and servants are personally liable to the injured party." Saxlehner v. Eisner, 140 F. 938, 941 (C.C.S.D.N.Y. 1905) (quoting Estes v. Worthington, 30 F. 465

(C.C.S.D.N.Y. 1887)); see also, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 223 (2d Cir. 2003) (affirming summary judgment against an infringing corporation and its controlling officers). The parties have submitted to the Court extensive materials regarding the involvement of each defendant in this action, including Innopex, Frankel, and Wagschal, and the undisputed facts show that all Defendants participated in the infringing activities. Innopex acted as a selling agent for its foreign subsidiary, Imperial, by communicating Imperial's offer to sell the "Gucci" watches to Exclusive. Frankel controls Innopex and is a director of Imperial, and he was involved with the brokering of the watches at issue. And Wagshal, Innopex's employee, served as the main point of contact for Exclusive and, among other things, communicated the offer for sale to Exclusive and instructed Exclusive regarding what to do with the shipment of 500 watches after Kay International refused to accept it. Thus, it is clear that each of these defendants authorized and facilitated the sale or offering for sale of the accused watches, and that they did so in New York where Exclusive is located.

In sum, the Court finds that the seven watches were counterfeit and that Defendants distributed the watches. Accordingly, the Court finds that there is no genuine issue of material fact regarding the likelihood of confusion. Having established both prongs of the Gruner test, Plaintiff is entitled to partial summary judgment on the issue of Defendants' Lanham Act liability.[1]

---

[1] Throughout the course of this litigation, and in their memoranda for the instant motions for summary judgment, Defendants advanced a theory that the watches in this case were genuine, good-quality Gucci products and that Gucci was attempting to control the resale prices of its watches by "bringing litigation to identify and cut off the authorized source which is supplying genuine goods to a defendant who resells at a much lower price than the manufacturer has authorized." (See, e.g., Def's. Mem. Supp. Def. Mot. Summ. J. at 3.) However, Defendants failed to put forth specific evidence to show that there was a genuine issue of material fact on the counterfeit issue. The Court notes that even if Defendants had successfully shown that the watches were genuine, Defendants likely would still be liable for trademark infringement for the unauthorized distribution of Gucci watches. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 395 (2d Cir. 1986).

**B.     Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim for Tortious Interference**

Gucci also seeks summary judgment with respect to Defendants' counterclaim for tortious interference with contract. (Pl.'s Mem. at 17.) Defendants claim that Gucci interfered with the contracts of "the last shipment of 500 [watches]" and "the additional agreement for sales of Gucci watches that Frankel and Israelson testified were going forward from Imperial to Exclusive, but were terminated due to Gucci's false claims and lawsuit." (Def.'s Mem. Opp. at 23 n.22) Gucci argues that Defendants cannot prove several elements of their claim.

As a preliminary matter, the Court notes that Defendants have not objected to Plaintiff's assertion that New York law applies to the counterclaim, and both parties used New York law to argue their points. Therefore, the Court will apply New York law. See Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 121 n.5 (2d Cir. 1998) ("Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state. It is therefore appropriate for this Court to apply New York law.").

Under New York law, to state a prima facie case for tortious interference with contract, a plaintiff must show: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional and wrongful procurement of the third-party's breach of the contract; (4) actual breach of the contract; and (5) damages resulting therefrom. See Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996)).

Defendants are not able to prove at least one essential element of their counterclaim—that Gucci intentionally and wrongfully procured the breach of a contract. While "it is clear that under New York law litigation or the threat of litigation can give rise to a claim for tortious interference with contractual relations,", litigation will give rise to such a claim only if the litigation is "wrongful." Universal City Studios, Inc. v. Nintendo Co., 797 F.2d 70, 75 (2d Cir. 1986). Under the Restatement (Second) of Torts, a lawsuit or the threat of a lawsuit is wrongful "if the actor has no belief in the merit of the litigation . . . [or] if the actor, having some belief in the merit of the suit, nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the

third parties and not to bring his claim to definitive adjudication." Restatement (Second) of Torts § 767, comment c; see also Universal City Studios, 797 F.2d at 75 (explaining that the New York State Court of Appeals has endorsed the provisions in the Restatement establishing the tort of tortious interference with a contract). In this case, Defendants have not offered any proof that Gucci lacked belief in the merits of this lawsuit. Accordingly, the lawsuit cannot serve as a basis of Defendants' counterclaim, and thus Defendants have failed to establish that Gucci wrongfully interfered with Defendants' contracts. Nor have Defendants provided any other basis on which they could be successful on their counterclaim. Plaintiff's motion for summary judgment on the counterclaim for tortious interference with contract is granted.

### C. Defendants' Motions for Summary Judgment

The Court turns now to Defendants' motions for summary judgment.

First, Defendants ask for summary judgement on the absence of willfulness. Defendants, relying principally on the unpublished opinion of the District of New Jersey in Gucci America, Inc. v. Daffy's, Inc., No. 00 Civ. 4463 (D.N.J. Aug. 29, 2002), argue that they did not willfully infringe Gucci's trademark and therefore are entitled to summary judgment on all claims for costs and Defendants' profits under section 35(a) of the Lanham Act, codified at 15 U.S.C. § 1117(a). According to Defendants, a finding of willfulness is a necessary prerequisite to any award of profits, damages, or costs under § 1117(a).

15 U.S.C. § 1117(a), provides:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a) or (d), or a willful violation under section 43(c), shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . The court in exceptional cases may award reasonable attorney fees to the prevailing party.

This statute was amended by the Trademark Amendments Act of 1999, Pub. L. 106-43, § 3(b), 113 Stat. 219. Prior to the 1999 amendment, section 1117(a) did not include any reference to the term "willful." But courts, including the Second Circuit Court of Appeals, established that a

finding of defendant's willful deceptiveness was a prerequisite for the awarding of profits under § 1117(a).  See, e.g., The George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537, 1540 (2d Cir. 1992).  The 1999 amendment replaced the phrase "or a violation under section 43(a)," with the language "a violation under section 43(a), or a willful violation under section 43(c)."  Pub. L. 106-43, § 3(b), 113 Stat. 219.  Subsequent amendments have changed the violations of the Lanham Act that qualify for profits, damages, and costs under § 1117.  See Pub. L. 106-113, § 3003(a)(2) (1999); Pub. L. 107-273, § 13207(a) (2002).  The statute now reads: "a violation under section 43(a) or (d), or a willful violation under section 43(c)."

Congress' 1999 revision makes plain that willfulness is a prerequisite for the awarding of profits, damages, and costs under § 43(c) of the Lanham Act.  It is not a statutory prerequisite for the awarding of profits, damages, and costs under §§ 43(a) and (d).  At the same time, the Court notes that Congress explicitly instructed that the awarding of profits, damages and costs under these sections would remain "subject to the principles of equity." 15 U.S.C. § 1117.  There may be times that principles of equity would require a court to make a finding of willfulness before awarding profits, damages, and costs.  And even where such a formal finding is not so required, the degree of a defendant's willfulness or innocence certainly could impact a district judge's discretion in awarding profits under § 1117.  See The George Basch Co., 968 F.2d 1532, 1537 ("Clearly, the statute's invocation of equitable principles as guideposts in the assessment of monetary relief vests the district court with some degree of discretion in shaping that relief.")

To the extent that willfulness remains a factor here, the Court finds that there are genuine issues of fact regarding Defendants' willfulness.  Having reviewed the record, the Court cannot conclude that a jury would be unable to find that Defendants willfully infringed Gucci's trademark.  Nor can the Court say that the jury would necessarily find the Defendants to have been willful in their infringement.  Therefore, summary judgment on the issue of willfulness is inappropriate.

Next, Defendants assert that the Court lacks personal jurisdiction over Defendants Innopex, Frankel, and Wagschal, and therefore that those defendants are entitled to summary judgment.  The

New York State long-arm statute governs here. See Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004). Under C.P.L.R. § 302(a)(2), tortious acts committed in New York state permit the exercise of jurisdiction over a foreign defendant. The Court has already explained that Innopex, Frankel, and Wagschal are liable under the Lanham Act because they sold infringing watches to Exclusive in New York who then offered the watches for sale to Kay International. Because defendants Innopex, Frankel, and Wagschal committed the tortious act of selling counterfeit watches in New York, the Court has personal jurisdiction over them. See Houbigant, Inc. v. ACB Mercantile, 914 F. Supp. 964, 979 (S.D.N.Y. 1995) ("Offering one copy of an infringing work for sale in New York, even if there is no actual sale, constitutes commission of a tortious act within the state sufficient to imbue this Court with personal jurisdiction over the infringers.").

Finally, Defendants seek summary judgment on the claims for injunctive relief. In light of the Court's finding that Defendants infringed Gucci's trademark by selling or offering for sale counterfeit watches, it would be inappropriate to grant summary judgment to Defendants on the remedy of injunctive relief prohibiting future infringement.

## III. CONCLUSION

For the above stated reasons, Plaintiff's motions for partial summary judgment on the issue of liability and for summary judgment on Defendants' counterclaim for tortious interference with contract are **GRANTED**. Defendants' motions for summary judgment are **DENIED**.

**SO ORDERED.**

New York, New York
March 14, 2007

_____
Richard Conway Casey, U.S.D.J.